UNITED STATES v. MERCHANTS' & MINERS' TRANSP. CO. et al.

(Circuit Court, S. D. Georgia, E. D.    March 8, 1911.)

1. CARRIERS (§ 30*)—INTERSTATE COMMERCE ACT—VIOLATION—FREIGHT RATES —FAILURE TO FILE—DEFENSES.

Interstate Commerce Act Feb. 4, 1887, c. 104; § 6, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3156), as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 (U. S. Comp. St. Supp. 1909, p. 1153), declares that every common carrier subject to the act shall file with the Interstate Commerce Commission and print, post, and keep open to public inspection schedules showing rates, fares, and charges for transportation between different points on its own route and points on the route of any other carrier by railroad, etc. *Held*, in a prosecution against certain interstate carriers for shipping certain freight at a 10-cent rate, when the published and filed rate was 15 cents per hundredweight, evidence that the 10-cent rate had been published by defendant's connections and sent "broadcast," though not filed, was inadmissible as a matter of defense, since the charging of a rate less than the filed rate constitutes a concession to the shipper, in violation of the act, as a matter of law.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 30.*]

2. CARRIERS (§ 30*)—INTERSTATE COMMERCE—RATES—KNOWLEDGE.

In a prosecution of an interstate carrier for shipping freight at a rate less than that filed with the Interstate Commerce Commission, defendant could not be heard to say that it did not know of the filed rate, which it had established in accordance with the law, as a justification for its departure therefrom.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 30.*]

Indictment of the Merchants' & Miners' Transportation Company, the Atlantic Coast Line Railroad Company, and the Seaboard Air Line Railway Company for violating the interstate commerce act as amended.

See, also, 187 Fed. 355.

Alexander Akerman, Asst. U. S. Atty., and W. M. Toomer, John H. Marble, and S. H. Smith, Sp. Asst. U. S. Attys.

Samuel B. Adams, A. Pratt Adams, and Daniel M. Hayne, for defendant Merchants' & Miners' Transp. Co.

Alexander Hamilton and Peter W. Meldrim, for defendant Atlantic Coast Line R. Co.

Anderson, Cann & Anderson, for defendant Seaboard Air Line Ry. Co.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SPEER, District Judge. Yesterday counsel for the defendant, in cross-examining the witness then on the stand, propounded the following question:

"Q. Mr. Lucas, in reference to these three cars, shipped January 3, 7, and 10, 1908, for which you charged 15 cents, and afterwards on May 29, 1909, collected 10 cents, why did you accept 10 cents, when you had charged and billed the shipment at 15 cents? A. That is because the shipment had at first been billed in error."

Counsel for the government objected to the question and answer. After an extended argument by both sides, the court requested Mr. Adams, counsel for the defendant, to state what he expected to prove by this question.

"Mr. Adams: The charge of 10 cents, we propose to show that he made the charge of 10 cents because— I mean, in one case he made the charge of 15 and collected 10, that he thought 10 cents would have been proper if his attention had been called to it, because these shipments, as he understood it, as so represented to him by the Pennsylvania Railroad through reports to him—that is a matter of documents—that it came from west of the Baltimore and Pittsburg lines; that there were two rates; one was a 10-cent rate applicable to such shipments as they understood them; witness was necessarily governed by the reports made to him by the railroad company; and that he intended to charge 10 cents wherever he thought that the property came from west of the Baltimore and Pittsburg lines.

"The Court: Were there any schedules filed with the commission which authorized him to charge 10 cents on shipments from that locality?

"Mr. Adams: Yes sir; we had the schedules in our office. They were not filed at the time, but they were sent out broadcast. They have since been filed by the Seaboard; but they were not filed at this time, and the difficulty was in the failure to file. We will show by this witness, if we are permitted to do that, that they were sent out broadcast, that there was no concealment about it, that the greatest publicity was given to them. We will show also by this witness that the statement in the indictment that it was done for and on account of Miller, in substance for his benefit, is not correct; that every shipper had the same rate; that there was no discrimination of any sort, shape, or kind, no favoritism of any sort, shape, or kind; that it was entirely open to everybody; that this 10-cent rate had been in actual operation since 1902, continuously; that since it has been the lawful rate there has been. no substantial difference as to the number of shippers who have availed themselves of this. We expect to show, and it certainly bears upon the exact charge made, in this case, in other words, if that be true, if your honor please, there was absolutely no object or motive in order to discriminate in favor of the Millers, none at all. There could not have been any. Therefore it was not a willful departure from the tariff. It may be that we are technically liable for a charge which is not made, namely, participating under a tariff which had not been filed actually. As I say, if we are permitted to do, we will show we supposed it was filed, and when we ascertained it was not filed, we endeavored to have it filed, and we will also show, if the court please, that we actually notified the railroads by letters and asked them to file it; that we did not have the slightest objection to charging the 15-cent rate when it was available; in point of fact, we charged 15 cents, and so billed the Millers as to the indictment covering the three counts, and there was a long discussion before this company finally yielded. Therefore it was bona fide of 15 cents. And, to avoid any mistake about it, and to get these matters fully in the record, because we know of no decision that is inconsistent with our construction of the word 'willful,' we would like an opportunity to present this in writing, exactly what we can prove, if your honor permits it. My junior, who is quite familiar with the fact, suggests we will also

offer to show that 17 "Best Ways to Ship" did not apply to these shipments west of Buffalo and Pittsburg lines, as to which the 10-cent rate would apply. It is the schedule in their office, they supposed it had been filed, and the one accepted by them, and the one sent out by them broadcast.

"The Court: But one which had not been filed with the Interstate Commerce Commission?

"Mr. Adams: No; had not been filed with the Interstate Commerce Commission at that time."

[1] The gravamen of the objection to the question now propounded, and the proof outlined in the statement of defendant's leading counsel, upon which he relies for a defense to these indictments, is that it does not meet the issues tendered by the government; that is to say, the charges in the indictment. The law imperatively commands that the carrier shall not depart from the rates filed by it with the Interstate Commerce Commission, and may be indicted if it fails strictly to observe that rate. That it did this is charged in the indictment. The schedule setting forth the purpose to charge a rate of 15 cents per 100 pounds on such commodities, and over the routes specified in the indictment, was completed by the connecting railway company, and the defendant then made its formal written concurrence therein. This concurrence and the schedule prepared were both filed with the commission. A copy of it, in book-bound form, was conspicuously kept in the office of the defendant company in the transaction of its business, and it was open to the public. This was labeled, and is termed by counsel "The Best Way to Ship." The Interstate Commerce Commission were, therefore, notified of this rate, and the public had the opportunity of making its calculations and their contracts in view of it.

Now, it is charged that this was willfully and knowingly done by the defendant company. It is also charged that various shipments of the commodities specified in the indictment were made by its ships, and with connecting lines, at the rate, not of 15 cents, but of 10 cents, per 100 pounds. This is not denied. It has been shown to be true by the testimony of the defendant's superintendent at Philadelphia, and by the various records which it kept of each transaction admitted in evidence, all of which, the superintendent stated, is "the truth of the transaction." Now, if I understand the law, the only proper defenses which can be interposed to this charge, thus supported, is to disprove the charges of the indictment, or to show that the defendant, having concurred in the rate of 15 cents made conformably to law, did not in fact knowingly and willfully ship the commodities at the rate of 10 cents per 100 pounds. Any other construction of the act, it appears to me, would make it a brutum fulmen, and give to the carriers or shippers an easy opportunity of avoiding its vital provisions. The charge is that the defendant applied a rate to its shipments of 5 cents per 100 pounds less than it had, conformably to law, agreed to charge, by its action with the government and with the public; this manifested by filing the 15-cent rate.

It is no reply to this to state that there was another rate for shipments from points west of a line from Pittsburg to Buffalo. It is conceded by defendant's counsel that this other rate was not filed with the Interstate Commerce Commission. It is stated that it was

spread broadcast; but to spread a rate broadcast through methods of the defendant company, or other companies, when the law requires that it shall be filed, is no compliance with the law, but is itself a violation of the law. Surely the defendant cannot be heard to defend one charge of crime by showing that it committed another. Every one is presumed to know the law, and every person, carrier, trade journal, or other journal, is by law informed that it may repair to the files of the Interstate Commerce Commission and find out what is the true and lawful rate, and that is the one which the carrier has filed there. A rate not filed is a nullity,and not to have filed it is a separate and distinct criminal offense, an offense not charged in this indictment. If the defendant filed this rate of 10 cents as required by law, or if such rate had been filed by another carrier and concurred in by it, compliance with it might be urged as proof of its good faith in departing from its rate of 15 cents; but no such rate was filed, and therefore, in contemplation of law, no matter how widespread may have been its use, proof of such use is no reply to this indictment, and cannot be admitted here as a matter of defense.

The object of the law is to protect every shipper, great or small, and if the carrier charges a greater or less, or a different, compensation than that provided in its filed rate, it is subject to prosecution. So absolute is this duty that it must collect its published rates in money. It is not free to accept services or property in payment thereof, or any consideration except lawful money. This is to make sure exact equality of transportation rates. This proposition is supported by Louisville & Nashville Railroad Company v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. ——, and Chicago, Indianapolis & Louisville Railroad Company v. United States, 219 U. S. 486, 31 Sup. Ct. 272, 55 L. Ed. ——. These cases were decided by the Supreme Court of the United States on the 20th day of last month.

[2] Nor can a corporation be heard to deny that it did not know of the rate which itself had established in accordance with the law, as a justification for its departure therefrom. In Atchison, Topeka & Santa Fé Railway Company v. United States (C. C. A.) 170 Fed. 256, 95 C. C. A. 452, the Circuit Court of Appeals for the Ninth Circuit declared:

"Since the defendant, of course, knew, and must be held to have known, the tariff of rates established and published by itself, the averment that, notwithstanding the alleged rate of $70 for the car referred to, the defendant in fact charged and accepted $64.75 only, would seem to be sufficient to constitute the concession prohibited by the statute."

By concession, in that sense, the court means a reduction in the rate, as represented by the charge of 5 cents indicated in the indictment and by the proof here.

Again, in Chicago, Burlington & Quincy Railroad Company v. United States, 157 Fed. 830, 85, C. C. A. 194, the Circuit Court of Appeals of the Eighth Circuit declared:

"The initial carrier which receives traffic and issues a bill of lading to ultimate destination should be held to have done so in view of the only rate which its connections are authorized by law to charge. The Interstate

Commerce Commission has held (2 Int. C. C. Rep. 656) 'when no other tariff is filed, the rates on traffic carried over or upon more than one line will be the sum of the local rates of the individual roads, or of local and joint rates, as the case may be.'"

This reference is to legal rates, and not to other or secret rates which have not been filed with the commission, no matter how widely they may have been published or applied, by the carrier.

In Standard Oil Company v. United States, 164 Fed. 376, 90 C. C. A. 364, Judge Grosscup, for the Circuit Court of Appeals of the Seventh Circuit, declares:

"In this respect the shipper and carrier stand on different grounds. The carrier is required by a separate provision of the law to establish and publish rates (section 6), and is forbidden to charge or collect from the shipper a rate greater or less than such established and published rate."

. He continues, citing authority therefor:

"That ignorance of the fact is no defense is perhaps applicable, for the carrier, having established and filed the rate, can very justly be denied the right to plead that he overlooked or forgot the rate that he has thus knowingly established and filed."

This is supported without reserve by the case of Standard Oil Company v. United States, 179 Fed. 614, 103 C. C. A. 172. The complaint is not that the carrier here failed to file. The complaint is that it shipped the commodities at a less rate than that which it did file. Nor is it any reply to say that in three instances it charged the rate of 15 cents, and attempted to maintain this; but, after an acrimonious correspondence with the consignors, the Millers in this case, it yielded to them, and did not collect the legal rate, but collected only 10 cents. This might be offered by the prosecution to show that the defendant acted with open eyes and full knowledge of the legal rate, but not by the defendant as excuse or justification.

This, indeed, is one of the definite mischiefs which the law seeks to prevent. The Millers, we may safely presume from the evidence, were large shippers, their business was important to the defendant company, they might stand out steadily, and acrimoniously contend for a less rate; and the defendant company might violate the law and yield to them. To a small shipper it would have been possible for the defendant company to pay little attention, and he might in vain have cried for the right to have withheld the 5 cents per 100 pounds which he claimed as a rebate. The law seeks to put all on a plane of equality, and that plane it intends shall be defined, not by the arbitrary will of any, but by the rate the carrier has filed, the justice of which rate itself is subject to supervision, and even to suspension, by the Interstate Commerce Commission.

As to the contention that the commodities were shipped in continuous carriage from points west of a line drawn from Buffalo, N. Y., to Pittsburg, Pa., and not from Philadelphia, as the bills of lading in evidence indicate, it might be competent for the defendant to show this. This might establish a variance between the allegation and the proof, and the best evidence of the fact would be the production of through bills of lading from such point of shipment, other than Phil-

adelphia to Jacksonville, or other competent proof, that the shipment was moving in continuous transportation from some other point than Philadelphia to its destination in Florida. The bills of lading in evidence, however, indicate that these bills were issued by the Merchants' & Miners' Transportation Company at Philadelphia, for shipment from that point by water and by rail to Jacksonville. To have made such shipment, unless it should be made to appear that the defendant did not know it, and did not intend it—that is to say, that it was not knowingly and willfully done—would be in my judgment a violation of the statute. Corporations and persons, if responsible, are held by law to intend to do precisely that which they do. Nor is it a defense to claim that the defendant urged its connecting lines to change the rate, if in point of fact it continued to ship the goods in accordance with the illegal rate not filed, or in utter disregard of the rate actually filed. The case of Gulf, Colorado & Santa Fé Railroad Company v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, is highly material for a proper understanding of this question.

Finally, to accept this defense as outlined by defendant's counsel, and to admit the evidence which he offers, might tend to confuse the jury as to the true issue; and that is, did the defendant, as charged in the indictment, knowingly and willfully ship the commodities described at a less rate than that set forth in its schedule of rates filed with the Interstate Commerce Commission? The law has fixed the standard, to which all business men and all corporations must repair. The ideal is stated by the Supreme Court of the United States, in New York Central & H. R. Railway Co. v. United States, 212 U. S. 495, 29 Sup. Ct. 307, 53 L. Ed. 613:

"One legal rate to be published and posted and accessible to all alike."

If, for one reason or another, the carriers, whose operations are, of course, largely veiled from the public, are allowed to depart from the standard, there might, on shipments from every point, be as many rates as there are points of origin from which commodities are brought to such points by shippers and merchants. There would be no redress for the public. The citizen might wait for years for his inquiry to be met. His protest might go unheeded. Utter and inextricable confusion and disorganization of business, with unconscionable advantage to the favored consignor or shipper, might result.

Railroad and other corporations are of great value to their security holders, and are a most beneficent agency to the public. No court has gone further than this to express its admiration for the blessings such corporations bestow upon the public; but it is retroactive to contend that they are not subject to regulation. We need not discuss elaborately the reasons of the law. Congress has enacted it. It has been held constitutional as against every form of attack which has been presented, and thus held by the supreme judicial tribunal of our country.

The court will admit all relevant evidence to show that the defendant did not knowingly and willfully ship the grain, as charged, at 10 cents per 100 pounds, or that it did not knowingly and willfully do the other acts which are essential to the indictment, and will also admit

proof, if it should be offered, denying the truth of the charges in the indictment. But it must be competent proof to meet such charges, and the proof outlined by defendant's leading counsel in his statement, requested by the court for the purpose of this ruling, is not such proof.

The evidence offered, therefore, must be excluded.