**POWELL et al. v. UNITED STATES.**
**No. 4597.**

Circuit Court of Appeals, Fourth Circuit.

June 10, 1940.

Murray Allen, of Raleigh, N. C., and Joseph F. Johnston, of Norfolk, Va., for appellants.

H. L. Maine, Sp. Asst. to U. S. Atty., of Wilmington, N. C. (James O. Carr, U. S. Atty., of Wilmington, N. C., John H. Manning, Asst. U. S. Atty., of Raleigh, N. C., and Charles F. Rouse, Asst. U. S. Atty., of Kinston, N. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

Appellants, in their capacity as receivers of the Seaboard Air Line Railway Company, were indicted in the court below, along with the Atlantic and North Carolina Railroad Company and the receivers of the Norfolk Southern Railroad Company, for violation of section 1 of the Elkins Act, 49 U.S.C.A. § 41, in failing to observe their published tariffs in connection with a shipment of scrap iron for export from Goldsboro, N. C. to Wilmington, N. C. The other defendants entered pleas of nolo contendere and were fined $1,000 each. Appellants waived jury trial, and, upon being found guilty by the judge, were fined the same amount. The sole question presented by the appeal is the sufficiency of the evidence to sustain the conviction; but this must be considered in connection with three contentions of appellants: (1) That the shipment was one in intrastate and not interstate or foreign commerce, (2) that the violation of the act was not wilful, and (3) that the receivers were not chargeable with responsibility therefor.

The shipment of scrap iron was made in July 1936 from Goldsboro to Wilmington, which is 84 miles distant by direct route. The shipment was not made over this direct route, however, which was the line of the Atlantic Coast Line Railroad Company, but over the Atlantic and North Carolina to New Bern, N. C., over the Norfolk & Southern from New Bern to Raleigh, N. C., and over the Seaboard Air Line from Raleigh to Wilmington, a total distance of 401 miles. The rate collected was $1.45 per hundred pounds, which was the rate for shipment by direct route from Goldsboro to Wilmington of both interstate and intrastate shipments. The interstate tariffs provided that the $1.45 rate was applicable only over lines where the haul did not exceed 153 miles. As the haul here exceeded 400 miles, it had no application; and the rate applicable under the tariffs was $2.50 per hundred.

The shipment was made by the Goldsboro Iron and Metal Company in the name of B. Schwartz to Schwartz under an order notify bill of lading. Prior to shipment, Schwartz had contracted to sell the scrap iron, subject to inspection, to Luria Bros.; and they in turn had contracted to sell it to Mit Sui & Company, a Japanese firm. Schwartz testified that this car of scrap iron was purchased for export under his contract with Luria Bros. The shipping order contained on its face the notation, "for export". A like notation was entered on the way bill which came into possession of the agents of appellants; and the freight receipt which they issued bore a like annotation. That the shipment was regarded by all parties as one in interstate or foreign commerce is shown by the fact that the agents of appellants assessed on the shipment certain emergency charges (known as "increased rate" or "IR"), applicable at that time only on shipments in interstate or foreign commerce and not on intrastate transportation. Upon its arrival in Wilmington, the carload of scrap iron was promptly loaded into the S. S. Helgoy, which had been chartered by Luria Bros., and which cleared from Wilmington for Japan with a cargo of scrap iron for the account of Mit Sui & Company.

There can be no question but that this evidence was sufficient to sustain a finding by the court that the shipment from Goldsboro to Wilmington was but a step in the transportation of the scrap iron to its real and ultimate destination in a foreign country. The case is not one of shipment to a point of collection or distribution, where the original movement comes to an end and further transportation depends upon sale or other circumstance. The journey in foreign commerce had commenced, and the mere fact that transfer of title at the port was contemplated and that inspection with right of rejection was provided for, did not change its essential character. Directly in point, we think, is the case of Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 234, 57 L.Ed. 442, a case involving a shipment of lumber from an inland point in Texas to the port of Sabine, Texas, for export. In holding that the fact that a foreign destination was intended at the time of shipment was determinative, and that the character of the shipment as being one in foreign commerce was not af-

fected by the fact that it was shipped to the exporter under an order notify bill of lading or that the original shipper had no further control over it after its arrival at the port of Sabine, the court said: "It is said, however, that the Sabine Company had no connection with the lumber after its arrival at Sabine, and had no concern with its destination after it came into the hands of Powell Company, and had no particular knowledge thereof. Like circumstances undoubtedly existed in Southern Pacific Terminal Co. v. Interstate Commerce Commission [219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310]. It did not prevail there and cannot prevail here. The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured, and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle, and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading, the commerce will be given local character, though it be essentially foreign."

Also directly in point, although involving import rather than export, is United States v. Erie R. Co., 280 U.S. 98, 50 S.Ct. 51, 52, 74 L.Ed. 187. The movement there was from the port of Hoboken, N. J. to Garfield, N. J. A shipment of wood pulp had been purchased in a foreign country through a broker. It was shipped to the broker as part of a larger shipment. The broker had it taken from the vessel at Hoboken and shipped by rail to Garfield under new and local bills of lading. Title did not pass to the purchaser until shipment by the broker at Hoboken. In holding the shipment one in foreign commerce to which the interstate rates prescribed by the Interstate Commerce Commission were applicable, the court said: "The carriers contend that title to the pulp does not pass to the company until the broker arranges, at the Hoboken dock, for shipment of the specific lot to Garfield; that the shipment by the mill to its agent, as consignee, of pulp in quantity exceeding that ultimately destined to Garfield, terminates, when the pulp is delivered on dock at Hoboken; that this foreign shipment is distinct from the subsequent shipment by the broker to Garfield of the smaller quantity, under a new and local bill of lading; and that therefore the rail movement from Hoboken to Garfield is an independent intrastate transaction. But the nature of the shipment is not dependent upon the question when or to whom the title passes. Pennsylvania R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 465, 466, 35 S.Ct. 896, 59 L.Ed. 1406. It is determined by the essential character of the commerce. Baltimore & Ohio S. W. R. Co. v. Settle, 260 U.S. 166, 170, 43 S.Ct. 28, 67 L.Ed. 189. It is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate, Ohio R. R. Commission v. Worthington, 225 U.S. 101, 108–110, 32 S.Ct. 653, 56 L.Ed. 1004; Texas & New Orleans R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; or by the fact that there may be a detention before or after the shipment on the local bill of lading, Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626. The findings of the commission, that the broker acts only as agent and that from the time that the pulp is put aboard the steamer there is a continuing intent that it should be transported to Garfield, ought to have been accepted by the District Court as conclusive, since there was ample evidence to sustain them. Western Paper Makers' Chemical Co. v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941; Virginian R. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L. Ed. 463. The rail transportation is in fact a part of foreign commerce."

See also Southern Pac. Term. Co. v. Interstate Commerce Comm., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Ohio R. R. Comm. v. Worthington, 225 U.S. 101, 32 S.Ct. 653, 56 L.Ed. 1004; Western Oil Refining Co. v. Lipscomb, 244 U.S. 346, 37 S.Ct. 623, 61 L.Ed. 1181; Baltimore & O. Southwestern R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189.

■ It is argued that the shipment was made by the Goldsboro Iron & Metal Co., that neither Schwartz nor Luria Bros. at that time had title to the property, and that

the Goldsboro Iron & Metal Co. contemplated no shipment farther than Wilmington. It appears, however, that the shipment was made pursuant to contract between the Goldsboro Iron & Metal Co. and Schwartz, that it was made in the name of Schwartz and that Schwartz knew that he was purchasing for export under his contract with Luria Bros. There can be no question, therefore, but that the shipment was intended from its inception as a movement in foreign commerce. This intention might have been frustrated, it is true, by a rejection of the shipment; but the shipment was not rejected and the nature of the movement was not affected by the right to reject. There was an original and continuing intention on the part of those having control of the shipment that, unless rejected, it should proceed to a foreign destination, and this, we think, was determinative of its character. The cases relied on by appellants are clearly distinguishable. In Gulf, C. & S. F. R. Co. v. Texas, 204 U.S. 403, 27 S.Ct. 360, 51 L.Ed 540, the movement in interstate commerce had ended and the shipment had come definitely to rest at a point of distribution before the transportation in question, which was clearly an independent movement, had begun. The same was true of the shipments involved in Chicago, M. & St. P. R. Co. v. Iowa, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988, and Seaboard Air Line R. Co. v. Lee, D.C., 14 F.2d 439.

■ And we think that the evidence is clearly sufficient to support a finding that the charging of a rate not authorized by the tariffs was wilful. The shipping order, the way bill and the freight receipt all showed that the shipment was "for export", and that the interstate rate was therefore applicable. Not only was this true, but the emergency charges, applicable only on interstate traffic, were assessed. This is certainly evidence that appellants knew that the shipment was one in foreign commerce to which the interstate tariffs were applicable; and any departure from the rates established by such tariffs is made an offense by the Elkins Act. 49 U.S.C.A. § 41(2). That Act provides: "In construing and enforcing the provisions of this section, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier, or shipper, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or shipper as well as that of the person. Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the preceding chapter, or participates in any rates so filed or published, that rate as against such carrier, its officers or agents, in any prosecution begun under sections 41, 42 or 43, shall be conclusively deemed to be the legal rate, and any departure from such rate, or any offer to depart therefrom, shall be deemed to be an offense under this section."

■■ When the evidence is viewed in the light most favorable to the government, as it must be on motion for directed verdict, the case is not one where the intrastate rate was innocently applied because of ignorance of facts which would subject the shipment to the interstate rate. The carrier had notice of the facts which rendered the interstate rate applicable; and it is a fair inference that the intention was to charge the interstate rate applicable on the direct route rather than on the route taken by the shipment. In any event, the charging of a lower rate than the one properly applicable was wilful within the meaning of the statute, in that it was the intentional doing of an act which the statute forbade. It is well settled that the use in the act of the word "wilful" does not require that there be an evil intent to commit the offense, but that it is sufficient if the act was done knowingly. Chicago, St. P., M. & O. R. Co. v. United States, 8 Cir., 162 F. 835, 842; Armour Packing Co. v. United States, 209 U.S. 56, 85, 86, 28 S.Ct. 428, 437, 52 L.Ed. 681. In the case last cited, which involved an indictment of a shipper in a prosecution under the act, the Supreme Court said: "It is contended by the petitioner that there is nothing in the facts found in this case to show any intentional violation of the law; that, on the contrary, the petitioner believed itself to be within its legal rights in insisting upon the performance of its contract, and maintained in good faith that the interstate commerce act [49 U.S.C.A. § 1 et seq.] did not and could not interfere with it, and that the statute had no application to a shipment of goods for exportation in the manner shown in this case. While intent is, in a certain sense, essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in or-

der to make out a crime, there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong. In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate. Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not, are liable under the statute because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law, is a question not decided because not arising on this record. The stipulated facts show that the shippers had knowledge of the rates published, and shipped the goods under a contention of their legal right so to do. This was all the knowledge or guilty intent that the act required. 1 Bishop, Crim.Law, 5th ed. § 343. A mistake of law as to the right to ship under the contract after the change of rate is unavailing upon well-settled principles. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244."

■■ Of course, the carrier cannot be heard to say that it did not know of the rate which it had established, as a justification for its departure therefrom. United States v. Merchants' & Miners' Transp. Co., C.C., 187 F. 363. Mistake of law as to the rate applicable would not constitute a defense. Armour Packing Co. v. United States, supra; Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244. Nor would negligence on the part of its employees in failing to comply with the requirements of the statute be a defense. United States v. Illinois Central R. Co., 303 U.S. 239, 58 S. Ct. 533, 82 L.Ed. 773.

■■ And there can be no question as to the liability of the receivers under the statute. They were indicted, of course, not in their individual capacities, but as operators of the railroad properties; and their liability under the act is the same as that of the railway company, had it been operating the properties. Beers v. Wabash, St.

L. & P. R. Co., C.C., 34 F. 244, 247. Receivers are specifically made subject to its penal provisions. 49 U.S.C.A. § 41(1). It is clear that in the operation of the railroad properties they are common carriers and can properly be made subject to the laws relating to such carriers, including penal laws as well as others. United States v. Nixon, 235 U.S. 231, 35 S.Ct. 49, 59 L. Ed. 207; Erb v. Morasch, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897; United States v. Ramsey, 8 Cir., 197 F. 144.

United States v. Nixon, supra, is directly in point. In that case receivers of the St. Louis & San Francisco Railroad Company were indicted for violation of the statute forbidding transportation of cattle from quarantine territory. Congress had amended the Quarantine Act to make its provisions applicable to common carriers generally and not merely to railroad companies. In sustaining the indictment of the receivers under the act, the court said [235 U.S. 231, 35 S.Ct. 50, 59 L.Ed. 207]: "The statute, as thus amended, applied to transportation of live stock over short lines belonging to private individuals or to lumber companies hauling freight for hire; to roads operated by trustees under power contained in a mortgage; and also to the more common case where a railroad was being operated by a receiver acting under judicial appointment. For in so far as he transports passengers and property he is a common carrier with rights and civil responsibility as such (Eddy v. Lafayette, 163 U.S. [456] 464, 16 S.Ct. 1082, 41 L.Ed. [225] 228; Hutchinson, Carr. § 77). And there is no reason suggested why a receiver, operating a railroad, should not also be subject to the penal provisions of a statute prohibiting any common carrier from transporting live stock by rail from a quarantine district into another state. Erb v. Morasch, 177 U.S. 584, 20 S.Ct. 819, 44 L.Ed. 897; United States v. Ramsey [8 Cir.], 197 F. 144, 42 L.R.A.(N.S.) 1031."

There was no error, and the judgment appealed from will be affirmed.

Affirmed.