UNION PETROLEUM CORPORATION, a Corporation, Appellant,

v.

UNITED STATES of America, Appellee.

No. 8646.

United States Court of Appeals Tenth Circuit.

April 10, 1967.

Rehearing Denied May 1, 1967.

Hugh Q. Buck, Houston, Tex. (Austin C. Wilson, Thomas J. Brorby, and Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., with him on the brief), for appellant.

Bruce Green, U. S. Atty., Muskogee, Okl. (Eugene J. Schubert, Atty., I.C.C.,

Washington, D. C., with him on the brief), for appellee.

Before PICKETT and HICKEY, Circuit Judges, and STANLEY, District Judge.

PICKETT, Circuit Judge.

This is an appeal from the judgment of the United States District Court for the Eastern District of Oklahoma, finding appellant Union Petroleum Corporation guilty of violating Section 1 of the Elkins Act, 49 U.S.C. § 41(1), and imposing a $1,000 fine for each of 26 counts of knowingly soliciting and accepting concessions from a common carrier through the device of claiming a transit privilege to which it was not entitled. Each count represents a separate carload shipment of liquefied petroleum gas (LPG) from the transit station in Sunray, Oklahoma to destinations in Missouri.

The controversy involves shipments of isobutane by Union from origins in Texas to Sunray, Oklahoma, selling the isobutane to Sunray D-X Oil Company, buying propane from Sunray D-X and shipping it to Missouri, paying the transit rate instead of the local rate for such shipments. Union, an Oklahoma corporation, is engaged in the distribution and sale of LPG. It purchased isobutane from suppliers in Texas and shipped it by railroad to Sunray, where Sunray D-X operates a refinery for the production of high octane motor gasoline. Pursuant to contract, Sunray purchased all of the isobutane delivered to it by Union, and Union purchased propane produced locally by Sunray D-X. Union neither owned nor leased any storage facilities at Sunray. Union did not store isobutane in any facilities at Sunray, but rather sold all of it to Sunray D-X. This isobutane contained a small amount of propane which was usually considered an impurity. The outbound propane involved was locally produced by Sunray D-X almost entirely from crude oil obtained elsewhere, and then it was sold to Union. Union then shipped this propane by railroad to destinations in Missouri, there to be sold to Gygr Gas Service.

The basic question to be determined is which of two tariffs, both lawfully published and filed with the I.C.C. by the carriers involved, is applicable to the above-described operation. One of the tariffs provided for a local rate of 51½¢ per cwt. from Sunray to the Missouri destinations. The other tariff provided a transit privilege which authorized the application of the balance of the through rate from the Texas origins plus a transit charge which resulted in a charge of 8½¢ or 9½¢ per cwt., depending upon the particular Missouri destination. The government contends that the local rate tariff is applicable, while Union contends that the transit tariff is applicable. Union paid the carrier on the transit tariff basis. If the transit tariff is applicable to the shipments of propane, then Union did not pay a lesser rate than specified by the applicable tariff. However, if, as the government charges, the local rate tariff is applicable to the propane shipments, then Union paid a lesser rate than specified and received concessions in violation of the Elkins Act.[1]

---

1. 49 U.S.C. § 41(1), provides in pertinent part:
"* * * and it shall be unlawful for any person, persons, or corporation to offer, grant, or give, or to solicit, accept, or receive any rebate, concession, or discrimination in respect to the transportation of any property in interstate or foreign commerce by any common carrier subject to said chapter whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said chapter, or whereby any other advantage is given or discrimination is practiced. Every person or corporation, whether carrier or shipper, who shall, knowingly, offer, grant, or give, or solicit, accept, or receive any such rebates, concession, or discrimination shall be deemed guilty of a misdemeanor, * * *" See Armour Packing Co. v. United States, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681, for a discussion of the Elkins Act and the elements of an offense thereunder.

It is stipulated that Union had full knowledge of all the published tariff rates, as well as all of the facts and circumstances surrounding the transportation of the isobutane from Texas to Sunray and the propane from Sunray to Missouri.

Union contends that the trial court erred in holding that it was not entitled to the transit privilege under Southwestern Lines General Transit Rules Tariff 174–U. It is Union's position that this tariff permits the substitution of outbound, non-transit propane for inbound isobutane; that there is no distinction in the tariff between isobutane and propane; that these are merely different forms of the same basic commodity, LPG, and as such, representative of each other. We cannot agree.

After careful consideration, we are satisfied that the record amply supports the trial court's conclusion that the transit Tariff 174–U does not contemplate such operation as occurred here.[2] Union strenuously urges that Item 2652, Part 2(c) of the Tariff specifically permits the substitution of outbound propane for the inbound isobutane. That Item provides in part: "In the operation of these rules it is impractical to maintain the identity of transit and non-transit tonnage in the shippers' facilities, and nothing in these rules shall prohibit the shipment of non-transit tonnage hereunder. * * *." We think, however, that Union misplaces reliance upon this provision, as it is apparent that Union had neither storage facilities nor transit tonnage at Sunray. This provision would seem to comprehend a different situation entirely.[3] Furthermore, we

2. An officer of the I.C.C. testified as follows:
"Q. Mr. Gibbs, if a person shipped in one item, such as iso-butane, from Texas to Sunray, Oklahoma, sold that iso-butane at Sunray, Oklahoma, and shipped out propane to either Boonville or Versailles, Missouri, would the shipment of propane from Sunray, Oklahoma, to either Boonville or Versailles, Missouri, come under which tariff, the one you were testifying about or any other tariff? * * * A. In the circumstances you related there, sir, the rate from Sunray that I have just mentioned, 51½¢ would be the applicable rate."
And, upon cross-examination, the government elicited the following testimony from an officer of the Southwestern Freight Bureau:
"Q. If you ship in isobutane and make high octane gasoline out of it, and ship it in under transit, and then ship in crude oil and make propane out of that, and ship the propane out which is made from the crude oil, can the shipment of the isobutane and propane be transit, if there is no connection between the two? A. No. * * *
Q. If you ship in isobutane and make high octane gasoline out of it 3% of the propane shipped in goes to butane but most of the butane is made from crude oil, which has nothing to do with the iso-propane and you ship then the propane out, is that transit as between the isobutane and the propane? A. Not on 97%, no."

3. The government's expert witness, an I. C.C. officer, testified as follows:
"Q. Now, sir, are you acquainted with this tariff? A. Yes, sir.
Q. I would call your attention to Item 2652 on page 256, Paragraph (c). A. Yes, sir.
Q. Would you explain the meaning of that particular paragraph (c)? A. Well, the paragraph says that in the operation of these rules, it is impractical to maintain the identity of transit and non-transit tonnage in the shippers' facilities, and nothing in these rules shall prohibit the shipment of non-transit tonnage hereunder provided the shipper shall surrender for cancellation freight bills in excess of inventory in storage as provided in 2.
While the operation of the rules, of course, permit storage in transit as being impractical to maintain their identity as transit and non-transit tonnage in the shippers' facilities, means that these are fundable articles or commodities that are being transited and that you may have some transit articles in storage, for example, this pertains to gas. The transit may have expired on those articles and you may have transit articles—you may have a type of gas, for example, isobutane stored with isobutane upon which the transit has not expired, and it means that you do not have to keep them separated. It would be impractical to do that because perhaps when they first went into storage they were all good for transit.

are aware of the I.C.C. decisions, cited by Union, which permitted certain substitution respecting corn, cotton, and wheat. Board of Trade of the City of Chicago v. Grand Trunk Western R. R. Co., et al., 255 I.C.C. 141; Substitution of Cotton in the Southwest, 241 I.D.C. 153; Stout v. Alton R. R. Co., et al., 227 I.C.C. 281. But these cases involved different commodities and different tariffs, and in each there was a finding that the application of transit rates was either not discriminatory or not unreasonable. Accordingly, they are not apposite herein. Cf. Calif. Milling Corp. v. Southern Pac. Co., 292 I.C.C. 146.

In Utah Poultry Producers Co-Op v. Union Pacific R. Co., 147 F.2d 975, 977, this court stated:

"Transit privileges grant special concessions to a shipper. In permitting them, the Interstate Commerce Commission has been zealous in protecting the integrity of the through rate. It is made plain in all its decisions that unless such privileges are carefully circumscribed, they permit opening the doors to discrimination and thus tend to destroy the integrity of the through rate. While transit privileges are justified solely on the theory that the identical article or its exact equivalent or its product is finally shipped to the ultimate destination, some substitution is permitted under carefully formulated rules and regulations. Where substitution has been permitted, it has been of a similar article from the same or a comparable rate point. In this way, the integrity of the through rate is preserved and discrimination and unfair trade practices are prevented." (Footnotes omitted)

The situation here, in effect, amounts to a complete substitution of basically dissimilar products. Isobutane and propane are neither commercial nor chemical equivalents. There was local disposal of the inbound isobutane and local acquisition of the outbound propane, with no perceptible relationship between these inbound and outbound shipments. We understand the transit tariff privilege to contemplate storage, which includes processing, and then re-shipment.[4]

■ Furthermore, considering the unfair economic advantage which Union may enjoy by shipping locally produced products at a lesser transit rate, the evil of discrimination against local shippers is readily apparent. Cf. Boone v.

---

Q. Okay, sir. Now do you construe that paragraph as meaning that, first of all, that before that paragraph comes into play, there has to be a transit item in storage? A. Yes, sir, it does.

Q. Now, sir, if isobutane was purchased in Texas and shipped to Sunray, Oklahoma, and sold and the purchaser of it made high octane gasoline out of this, and then that same purchaser had some crude oil and made propane out of the crude oil and perhaps 3% of it made up of these impurities in the isobutane and made propane out of it and this propane is shipped out, is that transit? A. It is not.

Q. Now if all of the gas, both isobutane and propane, stored at Sunray came in and went out in that manner, would any of it be transit? A. If all of the isobutane and all of the propane—

Q. Came in and went out in the manner I explained, would any of it be transit? A. No, it would not.

Q. And if none of it was transit, would Paragraph (c) of Item 2652 on page 256, in Tariff 174-U, become applicable if none of it was transit? A. No, if none of the item was transit, it would not be applicable.

Q. Now, sir, did you in your study of this tariff find anything in this tariff which would permit an operation such as I have described to be transit or classified as transit? A. No."

4. During post-trial arguments to the court, an I.C.C. officer explained the theory of transit in the following manner:
"* * * The theory of transit is that the product comes in, is stopped, something is done to it. It is stored with some manufacturing process and then it is re-shipped. Now they do permit substitution of a transit commodity, inbound commodity or non-transit commodity under certain circumstances where it is impossible to maintain the identity. They put it in the same storage facilities and they don't know which is the transit and which is the non-transit, and therefore they permit that, but there wasn't any transit. This transit operator had no facilities. He had no ownership. He had no control. He had no possession of the goods."

United States, 6 Cir., 109 F.2d 560. Indeed, we may not dismiss as insignificant the stipulation that Union charged its customer Gygr Gas Service according to the local rate tariff, or 51½¢ per cwt., and that Union would have lost money on the purchase and sale of the propane had it not been for the profit it made on the freight rates by paying the transit tariff rate and charging the purchaser with the local tariff rate. It is our understanding that such practice comes well within the intendment of the Elkins Act, which is "to eliminate rebates, concessions or discriminations from the handling of commerce, to the end that persons and places might carry on their activities on an equal basis." Union Pacific R. Co. v. United States, 313 U.S. 450, 461, 61 S.Ct. 1064, 1071, 85 L.Ed. 1453, reh. denied 314 U.S. 707, 62 S.Ct. 51, 86 L. Ed. 565.

 Union further asserts that it did not knowingly solicit or accept a concession, but acted in the honest and reasonable belief that it was entitled to avail itself of the transit tariff privilege. It is Union's position that such misinterpretation constitutes a valid defense to prosecution under the Elkins Act. Union relies primarily upon Lehigh Coal & Nav. Co. v. United States, 250 U.S. 556, 40 S.Ct. 24, 63 L.Ed. 1138. However, in Armour Packing Co. v. United States, 209 U.S. 56, 85–86, 28 S.Ct. 428, 437, 52 L.Ed. 681 cited by the government in support of its proposition that misinterpretation of the tariff is no defense, the Supreme Court stated:

"While intent is, in a certain sense essential to the commission of a crime, and in some classes of cases it is necessary to show moral turpitude in order to make out a crime, there is a class of cases within which we think the one under consideration falls, where purposely doing a thing prohibited by statute may amount to an offense, although the act does not involve turpitude or moral wrong. In this case the statutes provide it shall be penal to receive transportation of goods at less than the published rate. Whether shippers who pay a rate under the honest belief that it is the lawfully established rate, when in fact it is not, are liable under the statute because of a duty resting on them to inform themselves as to the existence of the elements essential to establish a rate as required by law, is a question not decided because not arising on this record. The stipulated facts show that the shippers had knowledge of the rates published and shipped the goods under a contention of their legal right to do so. This was all the knowledge or guilty intent that the act required."

Union stresses that the Armour case was decided prior to the insertion of the word "knowingly" into the Elkins Act by amendment of 1906. 34 Stat. 584, 587. We do not think that this amendment alters the fundamental principle that one's mistaken understanding of the law does not constitute a defense. See, Powell v. United States, 4 Cir., 112 F.2d 764; Boone v. United States, supra. Cf. Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (citing Armour). Furthermore, the term "knowingly" imports merely perception of the facts necessary to bring the questioned activity within the prohibition of the statute. The term does not require as a part of its meaning that there necessarily be knowledge or awareness that such activity is in fact prohibited. United States v. Keegan, 7 Cir., 331 F.2d 257, cert. denied 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed. 2d 37. Union had full knowledge of the tariffs as well as all facts which would render the transit privilege inapplicable and discriminatory herein, but it nevertheless operated upon the supposition of its legal right to do so. "The courts have found the statutes effective to accomplish the destruction of discriminatory practices, whatever their form. Violation of the commerce acts through receipt of advantages is to be tested by actual results, not by intention. Any and

all means to accomplish the prohibited end are banned." Union Pacific R. Co. v. United States, supra, 313 U.S. at 461–462, 61 S.Ct. at 1071.

Affirmed.