## UNITED STATES v. 1500 CORDS, MORE OR LESS, JACKPINE PULPWOOD.

### No. 301.

United States District Court
W. D. Wisconsin.

June 24, 1952.

Thomas E. Fairchild, U. S. Atty., Madison, Wis., for libellant.

T. W. Brazeau, Wisconsin Rapids, Wis., for respondent.

STONE, District Judge.

This proceeding was commenced by filing of a libel of information, and seizure by the Marshal, pursuant to warrant, of a quantity of jackpine pulpwood in the har-

bor at Ashland, Wisconsin, within this District. Thereafter, Consolidated Water Power & Paper Company, owner and claimant, paid to the Clerk of this Court the sum of $25,500 and promised that in the event the Court decrees a forfeiture and determines that the amount and value of said pulpwood in its then location in the harbor at Ashland, Wisconsin, was in excess of the sum deposited, claimant would pay into Court the amount of the excess so determined. Claim and answer were filed by claimant. On April 16, 1952, at Wausau, the issues came on for trial before the Court. A stipulation of facts was filed and additional testimony heard.

### Findings of Fact

Upon the stipulation of facts and the evidence duly offered and received upon this trial, the Court finds:

1. That the claimant, Consolidated Water Power & Paper Company, is a corporation duly organized and existing under and by virtue of the laws of the State of Wisconsin with its principal office at the City of Wisconsin Rapids, Wood County, Wisconsin, and that said company is engaged in the business of manufacturing paper and paper products.

2. That said company uses in the manufacture of paper a large amount of spruce, jackpine and other soft woods which are purchased in the Dominion of Canada and the State of Minnesota among other places and transported to Ashland, Wisconsin, across Lake Superior in rafts held together for such transporation by booms fastened to a vessel drawing such booms.

3. The Newaygo Timber Company, Ltd., is a corporation organized and existing under and by virtue of the laws of the province of Ontario, and Dominion of Canada with its principal office and place of business at the City of Port Arthur, Canada, and its capital stock or shares are wholly owned by said Consolidated Water Power & Paper Company.

4. That Consolidated Water Power & Paper Company owns a steamship known as the Butterfield located on Lake Superior, 750 IHP coal burner Class A–1 Great Lakes towing service with a steel hull built at Elizabeth, New Jersey, in 1919, number 218,244, purchased by Consolidated Water Power & Paper Company from United States Shipping Board having 429 gross tonnage, 203 net tonnage, 142 feet in length, 27.7 feet wide, with a registered depth of 14.8 feet equipped with radio, telephone and radar unit, which vessel is used to draw across Lake Superior said rafts of pulpwood from both Canadian ports and points in the State of Minnesota to Ashland, Wisconsin, where said pulpwood is taken out of the water, loaded onto railroad cars and transported to the mills of said company.

5. That Newaygo Timber Company, Ltd., owns a tug Rocket which is Canadian registered and is not documented under the laws of the United States, built in 1901 at Buffalo, New York, with steel hull and diesel engine No. 613B6 of 180 horse power purchased from T. J. McCarthy Steamship Company of Detroit, Michigan, in 1939 with a 39 gross tonnage, 27 net tonnage, registered length 62.4 feet, registered breadth 15 feet, registered depth 7 feet with no shore to shore radio.

6. That at the time involved in this proceeding there were attached to the Steamship Butterfield two booms made up of sticks or logs about 22 feet in length and 44 inches average in diameter fastened together by 1½ inch boom chains, the end of each log being fastened to the end of adjoining logs by such chains, the total length of each boom being approximately 3473 feet, the said booms being attached by single 1½ inch chain varying in length from a few feet to 1800 feet fastened to a winch on the Butterfield and a head block between the actual fastening of the booms and said chain extending to the Butterfield; that half the length of each boom is a double set of logs parallel and fastened in like manner.

7. That Sugar Loaf Landing is a cove or bay of water off Lake Superior extending into the shores of the State of Minnesota with the mouth of such cove or bay running north and south and about 1300 feet from the southerly and easterly end of the land bordering said cove to the northerly and easterly end of said cove, in

other words, the mouth of said cove being about 1300 feet in width; that said cove and the shores adjoining the same for some distance into the lake are shallow and such as to prevent the tug Butterfield coming into said cove.

8. That logs produced in Minnesota are hauled to said landing and dumped into the water where they are formed into rafts of logs to be transported to Ashland, Wisconsin; that there extend across the mouth of said cove what are known as storage booms consisting of logs or timbers fastened together with chains in the same manner as the towing booms fastened to the steamship Butterfield; that there are two sets of booms across the mouth of said cove anchored to the bottom of the water in the center with a float between the two sets of booms; that in the middle of each of said booms there is what is known as a gate which may be opened as desired in the operation of transferring the logs stored inside of said booms between the booms fastened to the steamship Butterfield; that logs intended for shipping are located inside of the storage booms until ready for transportation. That fastened to the southerly shore line point of said cove is a boom made up similar to the other booms but of lighter logs and extending westerly along the southerly shore of said cove a considerable distance, which boom is known as the "sweep boom", approximately 1300 feet in length, and is used for sweeping the logs out of the cove between the log booms attached to the Butterfield; that there is located within said cove a small gas work boat not of a size to be used on the lake for transportation purposes and which is used in gathering together the logs inside of said boom and pushing them toward the booms attached to the Butterfield.

9. That on September 15th or 16th, 1951, U. S. Steamer Butterfield was made ready to transport the pulpwood logs to the harbor at Ashland in the State of Wisconsin, and at dawn on September 16th the Butterfield was anchored about one half to three quarters of a mile from the Minnesota shore which was the nearest point to the shore line it could safely go. One of the ends of each of the so-called towing booms as above described was attached to the Butterfield. The shoreward ends of the towing booms were attached to the storage booms and the storage booms were opened between the points at which the towing booms were attached. The tug Rocket and the gas work boat were inside the enclosure formed by the towing booms and parts of the storage booms.

10. That about 7:00 o'clock A. M. operations began for the removal of the wood inside the cove toward the towing booms attached to the Butterfield. The sweep boom had previously been fastened around one mass of the wood; that such wood was too heavy for movement by the small gas boat and the Rocket fastened to the same and pulled it approximately one quarter of a mile into the space between the towing booms fastened to the Butterfield, which operation is shown in the picture marked No. 1 of the Government attached to the stipulation. The wood was then released from the sweep boom and the sweep boom replaced and fastened to the southerly point of said cove and the other end of the sweep boom was taken by the small boat and swept the remaining wood which was close to the shore and in water too shallow for the Rocket toward the towing boom. The Rocket helped, with the small boat, to sweep into the towing booms as shown in pictures 5 and 6, and then the small boat as shown in picture No. 7 swept in the remaining wood. The Rocket helped to swing the towing booms around so that they overlapped for all but about 250 feet. At that point all the pulpwood had been moved from one quarter to a half mile from shore and toward the Butterfield.

11. That after the operation of getting the wood into the towing booms, the Rocket replaced the storage booms and fastened the gates of the storage boom and helped fasten the shore end of the towing booms. About 9:00 o'clock A. M. September 16, 1951, the wood was all inside of the towing booms and the Butterfield got under way and towed the pulpwood logs from the position previously described to the harbor at Ashland, Wisconsin.

12. That the said pulpwood logs after arrival at Ashland, Wisconsin, were seized at that harbor on September 18, 1951, by a duly authorized representative of the Bureau of Customs of the Treasury Department of the United States. Thereafter this proceeding was commenced and the said pulpwood logs were seized by the Marshal and later released to the Consolidated Water Power and Paper Company pursuant to the order of this Court after deposit by the Consolidated Water Power and Paper Company of the sum of $25,500 with the Clerk of the Court, and after the further agreement by said company that, in the event the Court decrees a forfeiture and determines that the amount and value of said pulpwood logs in its then location in the harbor at Ashland, Wisconsin, was in excess of the sum deposited, the said company would pay to this Court the amount so determined. It was subsequently determined that the actual quantity of pulpwood seized in the proceeding was 2140.75 cords, of the total value of $35,-322.37.

13. That L. A. Bermel, Deputy Collector of Customs, in his official capacity and pursuant to the direction of Clara E. Sarvela, Collector of Customs at Duluth, Minnesota, viewed and appraised the said pulpwood logs at the harbor at Ashland, Wisconsin, and appraised them at a value of $30,000, and so reported on Customs Form 5955 "Report of Seizure to the United States Customs Service".

14. That the pulpwood seized in this proceeding was merchandise and was transported by water from the cove at Sugar Loaf Landing in the State of Minnesota to the harbor at Ashland in the State of Wisconsin.

15. That no part of said transportation was performed by the Tug Rocket. That the services of the Rocket together with the small boat working in connection with the Rocket was to gather together the logs and assist in floating them into and between the booms fastened to the Butterfield, which boat Butterfield was to transport the load when gathered into a final cargo from Sugar Loaf Landing, Minnesota, to Ashland, Wisconsin. That said transportation did not begin until the logs were gathered together and loaded into the booms of the Butterfield and the Butterfield started on its journey.

### Conclusions of Law

The Court concludes:

1. The 2140.75 cords of pulpwood seized in this proceeding was merchandise of the value of $35,322.37.

2. This merchandise was transported by water between points in the United States.

3. That the Tug Rocket performed no part of the transportation of said pulpwood between Sugar Loaf Landing, Minnesota, and Ashland, Wisconsin.

4. The said 2140.75 cords of pulpwood and no part thereof was subject to forfeiture for violation of Section 883, Title 46, U.S.C.A.

5. That the return of said $25,500 deposited in cash with the Clerk of this Court be stayed during the time allowed for an appeal and thereafter until an appeal is effected.

Let a decree be entered accordingly.