STATE *ex rel.* McCANLESS, COMMISSIONER OF FINANCE ETC., *et al. v.* STANDARD OIL CO. OF LOUISIANA.

(*Nashville,* December Term, 1948.)

Opinion filed March 8, 1941.

Rehearing Denied May 17, 1941.*

*Designated for Publication March 11, 1949.

360

Roy H. Beeler, Atty. Gen., William F. Barry, Sol. Gen., and Harry Phillips, Asst. Atty. Gen., for complainant.

T. M. Milling, of New Orleans, La., and Armistead, Waller, Davis & Lansden, of Nashville, for defendant.

Mr. Chief Justice Green delivered the opinion of the Court.

This is a suit of the State on the relation of the Commissioner of Finance and Taxation and the Attorney General to collect from defendant the so-called inspection fee said to have been imposed by section 6809 *et seq.*

of the Code on certain gasoline, tractor fuel, and kerosene stored in Tennessee during a three-year period beginning October 1, 1936. Defendant denied liability. The chancellor sustained the defense as to the gasoline and tractor fuel (classed as gasoline) in so far as section 6809 *et seq.* imposed a tax. He held defendant liable for so much of the imposition as represented a reasonable inspection charge, shown to have been 1/25 of the exaction. The chancellor held the kerosene subject to the whole imposition except a portion of that product not actually inspected. That portion he ruled subject to the tax included in the imposition but not to the inspection charge. Both parties appealed.

The defendant handled the gasoline and tractor fuel herein involved just as The Texas Company handled the gasoline in *The Texas Company* v. *George F. McCanless, Commissioner, et al.,* 177 Tenn. 238, 148 S. W. (2d) 360, and on the authority of that case the chancellor's decree with respect to the defendant's liability on account of the storage of those products is affirmed.

Section 1140 of the Code, as amended by chapter 130 of the Acts of 1933, considered at length in *The Texas Company* v. *George F. McCanless, Commissioner,* does not relate to kerosene. If the kereosene handled by the defendant is to be relieved of the burden of section 6809 *et seq.* of the Code it must be because the kerosene stored, upon which the imposition is based, remained in interstate commerce. The determination of this question, of course, requires consideration of the facts.

The defendant had a refinery at Baton Rouge, Louisiana. From that refinery it shipped large quantities of gasoline, tractor fuel, and kereosene to Memphis. These products were shipped in barges constructed for that

purpose. The defendant maintained thirteen or fourteen large storage tanks at Memphis.

Defendant had a considerable business in Arkansas, Mississippi, Kentucky, and Missouri. Its products could be delivered more cheaply in much of that territory through shipment by water to Memphis and distribution from Memphis to certain portions of the other States by railroad tank cars.

It is not necessary to consider the methods used by defendant in handling through Memphis its Ethyl gasoline, or Esso as it is called, and its methods of handling tractor fuel. Liability for tax with respect to these products is obviated by the Act of 1933 above referred to. Indeed, defendant's liability for the tax with respect to its straight gasoline, or Essolene as it is called, handled through Memphis, is thus obviated. However, the Essolene and kerosene were handled in the same manner and consideration of the method of handling the two products becomes necessary to determine defendant's liability with respect to the kerosene.

It is to be gathered from the proof that defendant's business was well organized and that by frequent reports and investigations defendant kept well posted on the probable needs of its trade. The Essolene and kerosene distributed from Memphis by defendant was shipped in bulk to supply the needs of defendant's whole trade out of Memphis—intrastate and interstate. When the barges containing these products would reach Memphis, such portion of the Essolene and kerosene as defendant contemplated would be needed in other States was pumped into separate tanks, marked "Export Tanks," maintained as described in *The Texas Company* v. *McCanless, Commissioner, supra.* The remainder of the Essolene and

kerosene, intended for defendant's Tennessee business, was pumped into other tanks. There was no separation of the Essolene and kerosene for the Tennessee trade from the Essolene and kerosene for the trade in other States until the barges reached Memphis.

As above stated, the defendant maintained thirteen or fourteen storage tanks at Memphis. According to figures given in the deposition of its president, the capacity of the export tanks was 89,000 barrels, the capacity of the tanks for Tennessee business was 212,700 barrels. The capacity of the kerosene export tanks was 10,600 barrels, the capacity of the kerosene tanks for Tennessee business was 43,300 barrels. From these figures it appears that much the greater portion of defendant's products distributed from Memphis was applied to Tennessee business. As to the kerosene, less than one-fourth of that product stored at Memphis was shipped out of the State.

Referring again to the testimony of defendant's president, it appears that the amount of Essolene and kerosene allotted to export tanks when the barges reached Memphis was based on estimates of its representatives and salesmen in the export territory. Orders for the Essolene and kerosene from this export territory were not received until after the allocation. The Essolene and the kerosene in the export tanks were placed therein to await orders, although it is fair to say that the defendant was able to estimate with much accuracy the extent of these orders and quantities of these products necessary to supply the orders.

The Essolene and kerosene stored in the export tanks might have been diverted by defendant to domestic needs but according to the proof there had been no such diversion.

The defendant contends that there was no break, in the sense of the law, in the interstate journey of the kerosene here involved from the refinery at Baton Rouge, Louisiana, until it reached its destination in Mississippi or Arkansas or State other than Tennessee. That the nature of the stop at Memphis of so much of the kerosene as went beyond limits of Tennessee was not such as to take the product from the flow of interstate commerce. The defendant rests its contention on the line of decisions of the Supreme Court of the United States such as *Texas & N. O. RR. Co.* v. *Sabine Tram Co.*, 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442; *Hughes Bros. Co.* v. *Minn.*, 272 U. S. 469, 47 S. Ct. 170, 71 L. Ed. 359, and *Carson Petroleum Co.* v. *Vial*, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626.

In *Texas & N. O. RR. Co.* v. *Sabine Tram Co.*, *supra*, lumber was ordered manufactured and shipped from mills in Texas to a seaboard point in that State. There was no sale for lumber at this port, all the lumber was designed for export when purchased, and all of it was exported. The fact that it was shipped on local bills of lading from one point in Texas to another in that State did not stamp the shipment as intrastate, since it was designed for export. The shipper was liable for the export rate established by the Interstate Commerce Commission and the Texas intrastate rate was not applicable. There was a continuity of transportation in which the delay and transshipment in ocean vessels did not make any break.

In *Hughes Bros. Co.* v. *Minn.*, *supra*, logs were cut in Minnesota and in accordance with a contract of sale were floated by river to Lake Superior and there loaded on the purchaser's ships for transportation to their destination

in Michigan. It was held that these logs began a continuous interstate journey when they began their drive down the river, not when they were loaded into the vessels, and that the logs were not subject to taxation in Minnesota after the floatage in the river began. As in the *Sabine Case,* it was held that a change in the method of transportation did not affect the continuity of the interstate movement.

The case of *Carson Petroleum Company* v. *Vial, supra,* is strongly pressed upon us by defendant's counsel both in brief and argument. In that case an exporter bought oil in interior States to fill foreign orders. The oil was shipped in railroad tank cars to a point on the Mississippi River in Louisiana and there stored in tanks. From these tanks it was pumped into ships for transportation to foreign consignees. None of the oil was sold from the tanks to local buyers. All of it went abroad. The oil was accumulated and held in the tanks for no purpose other than transshipment to foreign countries. Under these circumstances, it was held that the oil in the tanks was not subject to tax in Louisiana.

Other cases relied on by the defendant are akin to the foregoing. In most instances the merchandise, transportation of which was halted, had been sold before the initial shipment. None of it was intended for sale or distribution at the first stop. All of it was designed for the foreign buyer. The intermediate stops were quite generally for safety or availability of further transportation—to await the arrival of ships or safe, ice-free or usable waters. We think these cases are distinguishable from the case before us. The chancellor was of opinion that the present case fell within the authority of *General Oil Co.* v. *Crain,* 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed.

754. We are likewise of the same opinion. The holding of that case is aptly stated in the somewhat recent case of *Minnesota* v. *Blasius*, 290 U. S. 1, 54 S. Ct. 34, 37, 78 L. Ed. 131, as follows:

"In *General Oil Co.* v. *Crain*, 209 U. S. 211, 28 S. Ct. 475, 482, 52 L. Ed. 754, the company conducted an oil business at Memphis where it gathered oil from the North and maintained an establishment for its distribution. Part of the oil was deposited in a tank, appropriately marked for distribution in smaller vessels in order to fill orders for oil already sold in Arkansas, Louisana, and Mississippi. The Court held that the first shipment had ended, that the storage of the oil at Memphis for division and distribution to various points was 'for the business purposes and profit of the company,' and that the tank at Memphis had thus become a depot in its oil business for preparing the oil for another interstate journey."

It is likewise held in *General Oil Company* v. *Crain* that the storage of such oil in Memphis was a business subject to the identical imposition levied by section 6809 *et seq.* of the Code.

It is said, however, that the authority of *General Oil Co.* v. *Crain, supra,* has been weakened by criticism of that decision in *Carson Petroleum Co.* v. *Vial*, wherein it was pointed out, among other things, that the earlier decision was by a divided Court. We may, however, observe that the decision in *Carson Petroleum Co. v. Vial* was by a divided Court and that more recently *General Oil Co.* v. *Crain* has been frequently cited by the Supreme Court with apparent approval as in *Minnesota* v. *Blasius* just above referred to, *Nashville C. & St. L. R. Co.* v. *Wallace*, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. 730, 87 A. L. R. 1191; *Federal Compress & W. Co.* v.

*McLean,* 291 U. S. 17, 54 S. Ct. 267, 78 L. Ed. 622, and quite recently in *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33, 60 S. Ct. 388, 84 L. Ed. 565, 128 A. L. R. 876.

It seems to us, apart from the authority of *General Oil Co.* v. *Crain, supra,* the liability of defendant for the tax on the kerosene involved is sustained by several other decisions of the Supreme Court.

In what may be called the parent authority in cases like this, *Coe* v. *Town of Errol,* 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, logs were gathered in New Hampshire in what the Court termed an entrepot looking to ultimate transportation to another State. While thus stopped or stored, but before they had started on their final journey, these logs were held subject to taxation in the State of New Hampshire. In other words, the interstate movement had not begun and the mere fact that such movement was contemplated did not withdraw the property from the State's power to tax it.

A case quite in point is *Atlantic Coast Line R. Co.* v. *Standard Oil Co.,* 275 U. S. 257, 48 S. Ct. 107, 72 L. Ed. 270. In that case oil was shipped from foreign refineries to points in the State of Florida and there stored in tanks of the oil company. From these tanks the oil was distributed in the oil company's business in the State of Florida. The question was whether there was a continuous shipment from the refineries to the points of ultimate destination in Florida. The Court held that the original shipment ended when the oil was stored in the tanks at the Florida ports. That shipments from the tanks to the other Flordia points were intrastate and that intrastate rates were applicable to such reshipments.

In *Minnesota* v. *Blasius, supra,* cattle were consigned from other States to the stockyards in St. Paul, Minnesota. They were sold at the stockyards and were being held in pens there by the buyer, subject to his disposition. It was held that the cattle had acquired a situs for local taxation as the buyer's property, although in the course of his business he was offering them for resale in the same market, when the tax was imposed, and sold them soon afterwards for interstate consignment. In this case it was said:

"If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the state's power to tax it. *Coe* v. *[Town of] Errol,* 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82, 23 S. Ct. 266, 47 L. Ed. 394. If the interstate movement was begun, it may be regarded as continuing, so as to maintain the immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement. *Coe* v. *Errol, supra; Kelly* v. *Rhoads,* 188 U. S. 1, 23 S. Ct. 259, 47 L. Ed. 359; *Champlain Co.* v. *Brattleboro,* 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195. Formalities, such as the forms of billing, and mere changes in the method of transportation, do not affect the continuity of the transit. The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied. *Champlain Co.* v. *Brattleboro, supra,* 260 U. S. at page 377, 43 S. Ct. at page 146, 67 L. Ed. 309, 25A. L. R. 1195; *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm.,* 219

U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310; *Texas & N. O. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442; *Carson Petroleum Co. v. Vial, supra.* The mere power of the owner to divert the shipment already started does not take it out of interstate commerce if it appears 'that the journey has already begun in good faith and temporary interruption of the passage is reasonable and in furtherance of the intended transportation.' *Hughes Bros. Co.* v. *Minnesota*, 272 U. S. 469, 476, 47 S. Ct. 170, 172, 71 L. Ed. 359. Where property has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state, or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the state and is thus subject to its taxing power.''

Other decisions of the Supreme Court similar to the foregoing might be referred to but these are sufficient for illustration. Cases like this, dependent upon the facts for their solution, as the Supreme Court has recognized, are difficult. The Justices of that Court quite frequently differ in their conclusions as to the proper disposition of same. That Court, dealing almost daily with questions arising under the Commerce Clause of the Federal Constitution, article 1, sec. 8, cl. 3, finds difficulty in dealing with such questions. Necessarily a Court like this, where such questions infrequently arise, has much more difficulty. It is a matter of gratification, therefore, that errors on our part in such matters can be corrected.

If the defendant here, after unloading the barges at Memphis, had stored the Essolene and kerosene indiscriminately, commingling that intended for domestic use and that intended for use out of the State, such storage

would clearly have been taxable. The initial shipment having ended at Memphis, the storage of the products at Memphis was taxable until another interstate shipment had begun. It does not seem to us that the storage in separate tanks of an amount of gasoline estimated to be required to fill future orders in other States, to be shipped out when those orders were received—it does not seem to us these things amounted to the beginning of another interstate journey.

The defendant refers to a number of decisions of the Supreme Court of the United States which we do not find it necessary to consider. Cases arising under the anti-trust law and cases considering statutes regulating the purchase and sale of products in interstate commerce. These decisions are not applicable here.

Counsel for defendant press upon our consideration a discussion of the *Berwind-White* and earlier cases by Professor Powell in Harvard Law Review, Vol. 53, No. 6, p. 909. Among other things the learned commentator takes the position that when a use tax is imposed with respect to goods introduced from sister States, a distinction should be made in favor of wholesalers and jobbers who receive and store goods awaiting orders from other States. This, because he thinks the ultimate burden in such case will fall on the consumers in other States. However, it is recognized that the Supreme Court has not made such a distinction yet and, as an inferior tribunal herein, we think it more seemly to endeavor to follow the higher authority than to pioneer.

■ Defendant assigns error upon the action of the chancellor in taxing it with cost of the actual inspection of all its products stored at Memphis. We think there was no error in this, regardless of whether the products

had left the channels of interstate commerce or not. *Pure Oil Co.* v. *Minnesota,* 248 U. S. 158, 39 S. Ct. 35, 63 L. Ed. 180.

■ It is to be doubted, however, whether this question is properly before the Court. The defendant prayed a special appeal from only so much of the chancellor's decree as taxed it with part of the costs and as held it liable "for any portion of the tax sued for." It was fully recognized by defendant all through the case that sections 6809 *et seq.* of the Code levy an imposition which includes both a tax and an inspection fee. The appeal appears to be limited to the tax.

The only evidence with reference to the amount of the inspection fee is that 1/25 of the imposition of section 6809 *et seq.* of the Code was the actual cost of inspection. There is nothing to indicate that an inspection fee in this amount was excessive. We find no reason to question the chancellor's finding that inspection was made of such part of the products as he charged with the cost thereof.

■ As for the discrimination complained of between the excise tax on the storage of kerosene and the excise tax on the storage of gasoline, it is sufficient to say that Section 28 of Article 2 of the Tennessee Constitution authorizes the Legislature to tax privileges "in such manner as they may from time to time direct." We do not understand that classification for taxation is forbidden by the Fourteenth Amendment to the Federal Constitution. Storage of gasoline and storage of kerosene are different privileges.

■ Apart from the foregoing, defendant has no standing to question the constitutionality of section 13 of chapter 130 of the Acts of 1933. It stores in Tennessee three

or four times as much gasoline as kerosene. Instead, therefore, of being adversely affected by any discrimination in the Act of 1933, it is a beneficiary thereof.

The decree of the Chancellor is affirmed. Defendant will pay one-third of all of the costs of this Court and two-thirds of the costs will be taxed to the State.

DeHaven, J., and Frank T. Fancher, Special Justice, dissent. Chambliss & McKinney, JJ., concur.