## UNITED STATES v. 1500 CORDS, MORE OR LESS, JACKPINE PULPWOOD.

### No. 10742.

United States Court of Appeals
Seventh Circuit.
June 16, 1953.

Paul A. Sweeney, Attorney, Department of Justice, Washington, D. C., Frank L. Nikolay, U. S. Atty., Madison, Wis., Warren E. Burger, Asst. Atty. Gen., Benjamin Forman, Attorney, Department of Justice, Washington D. C., for appellant.

Theodore W. Brazeau and Richard S. Brazeau, Wisconsin Rapids, Wis., for appellee.

Before MAJOR, Chief Judge, and DUFFY and FINNEGAN, Circuit Judges.

FINNEGAN, Circuit Judge.

On September 26, 1951, the Government of the United States filed a libel in the Western District of Wisconsin against 1500 cords, more or less, of jackpine pulpwood for an alleged violation of sec. 27 of the Merchant Marine Act of 1920, 41 Stat. 988, 999, 46 U.S.C.A. § 883.[1]

The District Court, after a hearing on the merits, dismissed the libel and directed that the cash deposited by Consolidated Water Power & Paper Company, owner and claimant of the merchandise seized, in the sum of $25,500, in lieu of the seized goods, be returned.

The Government prosecutes this appeal to reverse that judgment of the District Court.

The detailed finding of facts, together with the conclusions of law by the trial court, are fully reported in 108 F.Supp. 224, hence it is proposed to make only a very brief summary of such facts in this opinion.

The claimant is a Wisconsin corporation engaged in manufacturing paper and paper products. It purchases the pulpwood, which it uses in its business, in Canada and Minnesota and transports it to the site of its mills near Ashland, Wisconsin. The claimant owns the entire capital stock of the Newago Timber Company, Ltd., which is a Canadian corporation.

The pulpwood involved in this proceeding was purchased by claimant in Minnesota where it was grown. When cut, the logs were floated on the waterways of Minnesota to Sugar Loaf Landing, Minnesota, a cove or inlet of Lake Superior. The mouth of this cove lies north and south and is about 1300 feet in width. Two storage booms, consisting of logs fastened together by chains, are stretched across the mouth of the cove. There is a gate attached to each storage boom which may be opened to allow the removal of logs stored within the cove. On the south shore of the cove is a sweep boom about 1300 feet in length, which is used for sweeping pulpwood out of the cove.

On about September 16, 1951, the American Steamer Butterfield appeared at Sugar Loaf Landing to transport the pulpwood stored over to Ashland, Wisconsin. The Butterfield is owned by claimant, Consolidated Water Power and Paper Company. Because the cove and the adjoining waters are very shallow, the Butterfield was unable to enter there and was consequently anchored one half to three quarters of a mile off the Minnesota shore.

At that time there was present at Sugar Loaf Landing a small gasoline work boat,

[1] "No merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by section 13 or 808 of this title: Provided, * * * (provisos are irrelevant to a consideration of the problem presented on this record)."

and also the Canadian tug Rocket, owned by Newago Timber Company, Ltd.

When the Butterfield arrived, two towing booms, consisting of logs bound to each other by chains, were attached to the steamer. The shoreward end of the northerly towing boom was attached to the storage boom fixed at the north side of the cove, and the shoreward end of the south boom was attached to the storage boom located at the south end of the cove. The lakeward end of the booms were fastened and attached to the Steamer Butterfield. The small gasoline work boat and the Canadian tug Rocket were inside the enclosure formed by the storage and towing booms.

Thereupon, the tug Rocket proceeded to open the gates in the storage booms. After they were opened the tug fastened to the sweep boom, which had previously been fastened around one mass of pulpwood and pulled the logs, being about 400 cords, between the towing boom logs attached to the Steamer Butterfield. The pulpwood was then released and the sweep boom returned to the cove. After that the tug Rocket, aided by the gasoline work boat, swept the remaining pulpwood from the cove into the towing booms attached to the Steamer Butterfield.

When that work had been completed and all the logs which were to be carried to Ashland, Wisconsin, had been placed within the lakeward end and the north and south sides of the towing boom, there remained only the task of sealing or closing the landward end of the towing boom. The tug Rocket accomplished this by disconnecting the shoreward end of the north towing boom from its attachment at the north side of the cove, drawing it across the mouth of the cove and fastening it to the south towing boom. It then disconnected the south towing boom from its attachment at the south end of the cove and likewise brought it across the cove to the northerly towing boom. The enclosure of the logs to be transported was thus completed. The landward end of the towing boom was sealed and the pulpwood destined for Ashland, Wisconsin, was entirely enclosed within the towing booms.

The storage booms across the mouth of the cove were then replaced and their gates closed by the tug Rocket, whose work was then completed.

After logs to be transported were enclosed within the towing booms attatched to the Steamer Butterfield, it proceeded to get under way, towing the pulpwood to Ashland, Wisconsin.

Upon its arrival at Ashland a representative of the Treasury Department of the United States seized the logs, as forfeited under sec. 27 of the Merchant Marine Act. This proceeding was thereupon commenced and the pulpwood taken by the marshal. It was later released to the claimant, pursuant to order of the court, after deposit by the claimant of the sum of $25,500 with the clerk of the court. On this appeal the Government insists that the District Court erred in holding that the tug Rocket performed no part of the transportation of the logs in question from Minnesota to Wisconsin, and urges that a violation of sec. 27 of the Merchant Marine Act has been established and that the judgment of the trial court should be reversed. The Consolidated Water Power and Paper Company, appellee, contends that the gathering and shunting of the logs into and between the booms attached to the Butterfield was a mere assembling and loading operation, and that it did not come within the purview of sec. 27 of the Merchant Marine Act.

No reported case has been furnished or discovered which involved a seizure of cargo by the United States under sec. 27 of the Merchant Marine Act, because a boat of foreign registry had performed services similar to those rendered in the case at bar by the Canadian tug Rocket.

A somewhat comparable situation and problem has, however, arisen in many cases wherein a State, or the agency of a State attempted to tax goods which the owner claimed were in transit, or being transported in interstate commerce. In such cases it frequently becomes material to determine when transportation in interstate commerce begins. Extensive annotations will be found in 25 A.L.R. 1195, and 11 A.L.R.2d 938 on the topic: "Property destined for,

or in the course of, removal from a state as subject to taxation."

Both appellant and appellee direct our attention to the following cases, cited in the above annotations: Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Champlain Realty Co. v. Town of Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 67 L.Ed. 309; and Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359. The Government cites these cases as supporting their contention that the interstate transportation of the pulpwood logs here involved began with the operations of the Canadian tug Rocket. Appellee, on the other hand, asserts that these cases support its contention that the assembling of the logs and the shunting into and between the towing booms attached to the Steamer Butterfield was not transportation within the meaning of section 27 of the Merchant Marine Act.

Coe v. Town of Errol, 116 U.S. 517, 6 S. Ct. 475, 479, 29 L.Ed. 715, involved the taxation of certain logs by the State of New Hampshire. In that case the logs had been cut in New Hampshire and drawn down to Errol in the same state and there placed on the banks of Clear Stream, a New Hampshire waterway, to be thence floated down the Androscoggin River to the State of Maine. The logs had been placed in Clear Stream for a considerable portion of the winter season. The question was: Were the logs taxable in New Hampshire, or were they in interstate commerce, in transit, through New Hampshire and hence not subject to taxation in that State? The Court, speaking through Mr. Justice Bradley, said:

"The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation. It is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is a matter altogether *in fieri*, [to be done] and not at all a fixed and certain thing."

Under the facts and circumstances shown in the Coe case, the Supreme Court affirmed the power asserted by New Hampshire to tax the logs, citing The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999, to the effect that whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced.

In Champlain Realty Company v. Town of Brattleboro, 260 U.S. 366, 43 S.Ct. 146, 148, 67 L.Ed. 309, another tax case, it appeared that the owner had cut pulpwood in several towns in Vermont. The logs were placed upon the Vermont banks of the West River and its tributaries to be floated down into the Connecticut River and thence to their destination on the New Hampshire side of the Connecticut River. 4,000 cords had been floated down the West River and had reached a boom at the mouth of the West River. Because of high water in the Connecticut, it was thought unsafe to let the wood into that river. It was contended that the logs which were held in the boom at the mouth of the West River were taxable in Vermont. The Supreme Court held otherwise finding that the interstate journey of the logs had begun when the boom was reached. The Court said the boom was not a depot for the gathering of logs preparatory to their final journey to New Hampshire, but that it was a safety appliance in the course of the final journey, as the Court put it, "It was a harbor of refuge from danger to a shipment on its way."

Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359, was also a tax case. In that case the ques-

tion arose as to the power of the State of Minnesota to tax pulpwood owned by the timber company whose principal office was in Cook County, Minnesota.

After referring to prior cases such as Coe v. Town of Errol and Champlain Realty Co. v. Town of Brattleboro, Chief Justice Taft said on page 475 of 272 U.S., on page 172 of 47 S.Ct.:

> "The conclusion in cases like this must be determined from the various circumstances. Mere intention by the owner ultimately to send the logs out of the state does not put them in interstate commerce, nor does preparatory gathering for that purpose at a depot. It must appear that the movement for another state has actually begun and is going on. Solution is easy when the shipment has been delivered to a carrier for a destination in another state. It is much more difficult when the owner retains complete control of the transportation and can change his mind and divert the delivery from the intended insterstate destination as in the Champlain [Realty] Company Case."

The Court held that the logs were not taxable in the State of Minnesota.

The distinction between the case at bar and the Hughes Brothers case, which the Government professes to be unable to see, appears plain to this court. Using the language of the Supreme Court it appears to us that the sweeping, drawing or bunting of the logs into the space between the towing booms attached to the Butterfield on the one end and to the Minnesota shore on the other end was not transportation in interstate commerce. It was merely forming a bundle or package of logs to be carried on an interstate journey. They could not be so carried until the respective sides of the towing boom had been detached from the Minnesota shore and had been arranged and secured so as to form a sealed backing for the towing boom. Until that had been done the logs could not begin their interstate journey. They were not under the control of, or within the power of the Steamer. Therefore the interstate movement did not begin indeed could not have begun, until the tug Rocket had sealed the landward end of the towing boom. As we have already stated, the Butterfield did not get up power and start for Wisconsin until the landward portion of the towing boom had been formed and sealed.

The judgment of the District Court is Affirmed.