**FARMERS UNION COOPERATIVE MARKETING ASSOCIATION and George M. Howard, Plaintiffs,**

**v.**

**STATE CORPORATION COMMISSION OF KANSAS; Hon. William L. Mitchell, Chairman; Hon. Alvin F. Grauerholz and Hon. Harry G. Wiles as Members; Kansas Highway Patrol and Col. Lawrence Hughes, Superintendent, Defendants.**

**No. KC–2041.**

United States District Court
D. Kansas.

May 17, 1969.

## MEMORANDUM OF DECISION

ARTHUR J. STANLEY, JR., Chief Judge.

This action for injunctive relief seeks to permanently enjoin and restrain the defendants, and any of their agents, attorneys and employees, from interfering with the activities of the plaintiffs, and others similarly situated, insofar as their activities may be found to be in the nature of interstate commerce. Plaintiffs were granted a preliminary injunction by this court on January 28, 1964, pending disposition of a similar case then before the Court of Appeals for this Circuit. That case has been decided (State Corporation Commission v. Bartlett & Co., Grain, 338 F.2d 495 (10th Cir. 1964); *cert. denied,* 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965)). The present case is now ripe for determination upon motions for summary judgment filed by both parties.

The plaintiff Farmers Union Cooperative Marketing Association, hereinafter referred to as Farmers Union, is a Kansas corporation, and is an agricultural marketing cooperative within the meaning of the pertinent statutes. 49 U.S.C.A. § 303(b) (5). The plaintiff George M. Howard is an individual, doing business as a common motor carrier for hire, and, insofar as this action is concerned, is engaged in the carriage of grain commodities to elevators owned and operated by Farmers Union which are located in the Fairfax District of Kansas City, Kansas. This carriage initiates at various points inside the State of Kansas.

The defendant State Corporation Commission, hereinafter referred to as the Commission, is a public body organized under the laws of Kansas, is charged with the administration and enforcement of the laws of Kansas relating to motor carriers, and has the power and duty to institute and prosecute appropriate civil and criminal proceedings with relation thereto. The defendant Kansas Highway Patrol is an agency of the State of Kansas charged with enforcing

Tom B. Kretsinger, of Kretsinger, Kretsinger & Edell, Kansas City, Mo., and John E. Jandera, of Townsend, Jandera, Hope & Buckly, Topeka, Kan., for plaintiffs.

E. Edward Johnson and Charles Escola, Topeka, Kan., for defendant State Corp. Commission.

Robert C. Londerholm and Kenton C. Granger, Topeka, Kan., for defendant Kansas Highway Patrol.

the rules and regulations relating to motor carriers promulgated by the Commission.

The plaintiff Farmers Union, as a grain commodities marketing corporation, has as its principal business the purchase and sale of grain. This operation is conducted at its elevators in the Fairfax District of Kansas City, Kansas. The Fairfax elevator complex includes facilities for unloading grain shipped by truck and by rail, for the grading of shipments received, for storage of grain (in elevators having a total capacity of 11,500,000 bushels), and for loading out of grain by rail and by barge. In addition thereto, Farmers Union owns and operates a small number of local elevators, located at various points within the State of Kansas, as well as a few trucks and barges.

The entirety of the stock ownership of Farmers Union is held by some 260 local cooperatives. The majority of these stockholders are located in the State of Kansas, while a lesser number are located in the neighboring states of Missouri, Nebraska and Colorado. However, it is undisputed that Farmers Union is a legal entity distinct from the local cooperatives who are its members and sole owners, and that they have no power of control over its operations save that ordinarily incident to stock ownership.

The operations of Farmers Union involve the purchase, storage and sale of grain commodities of all kinds, all purchases being made from the local cooperatives who are its owners. Approximately ninety percent of the sellers are Kansas cooperatives, and it is only those transactions which are involved here.

All of the shipments of grain involved in this case originate at the elevators of the local Kansas cooperatives, and move via motor carrier to the Farmers Union elevators in the Fairfax District of Kansas City, Kansas. The selection of a particular motor carrier to transport a shipment of grain is made by the local cooperative, and the rate charged for carriage is determined by negotiation between the local shipper and the carrier. The transaction between Farmers Union and the local cooperative is not consummated until the shipment reaches the Fairfax elevators and has been weighed and classified as to grade. Shipments are made F.O.B. Kansas City, the shipper having the right to divert the shipment at any time prior to the completion of the transaction at the Fairfax elevator if he is dissatisfied with the price offered, the grade classification given the shipment, or for any other reason. The shipment being under the control of the local cooperative, it has sole control over the rate to be paid for carriage.

Once a shipment of grain has been purchased by Farmers Union, it is placed in storage in the elevators, commingled with other grain of like grade and quality. Other than the mixing and blending process, whereby grain of a particular classification is made up for shipment out of that in storage in the Fairfax elevators, there is no manufacturing or other alteration of the grain. It is stored in the elevators until sale and shipment by Farmers Union. No attempt is made by Farmers Union to segregate any particular incoming shipment, grain of various grades being mixed together to make up whatever quantity of a particular grade may be needed to fulfill a contract of sale.

Grain is shipped out from the Fairfax elevators as it is sold. No grain is purchased to fill a pre-existing contract of sale, it being the practice of Farmers Union to keep on hand a sufficient quantity of grain in storage to fulfill its contracts as they are made. Certainly, in view of the nature of grain commodities, and the seasonal production thereof, no other procedure would be practical.

The grain sold by Farmers Union is moved from the Fairfax elevators by both rail and barge. All barge shipments are destined for points outside the State of Kansas. All rail shipments must, of necessity, pass through the State of Missouri. Because of the rate advantage afforded Farmers Union by preservation of "in-transit balances," an

attempt is made to strike a balance between the shipments received by rail at Fairfax, and the outgoing shipments by rail. A corresponding effort is made to ship out by barge an amount of grain equal to that received in shipments by motor carrier. It appears that these shipments do balance out to within a few bushels over the course of a year's operations. Better than ninety-eight percent of outbound shipments from the Fairfax elevators are destined for points outside the State of Kansas, and all outbound shipments must pass some distance outside that state. The small percentage of shipments to points within the state are isolated transactions, and do not represent the ordinary operations of Farmers Union.

The shipments of grain to Farmers Union from the local cooperatives are exempt from rate regulation by the Interstate Commerce Commission. 49 U.S.C.A. § 303(b) (6). Hence, absent other regulation, the rates charged for carriage are determined purely by negotiation between the shipper and the motor carrier on a shipment by shipment basis. The plaintiff Howard is a common motor carrier for hire who handles shipments of this kind. The defendant Kansas Corporation Commission has published a tariff on intrastate carriage of grain, and seeks to enforce it against the plaintiff Howard and others similarly situated. The defendant Kansas Highway Patrol has been joined as the state agency charged with the enforcement of the regulations of the Commission relating to common motor carriers.

The single issue presented by this case is whether the shipments of grain from the local elevators to Farmers Union's Fairfax elevators are transportation in intrastate or interstate commerce. If the former, then they are subject to regulation by the Commission, while if the latter, they must be considered as exempt from state regulation.

By their amended answer, the defendants attempted to question the jurisdiction of this court by raising an issue as to the standing of the plaintiffs to maintain this action. An examination of the various briefs, and the suggested findings of fact and conclusions of law, submitted by the defendants discloses nothing touching upon this question. It will be regarded as abandoned by the defendants, and will not be considered.

The disposition of this case has long been delayed, pending final disposition of a case styled State Corporation Commission v. Bartlett & Co., Grain, *supra*, in the hope that it would facilitate the determination to be made here. That delay was not in vain, as will appear from the discussion following.

The *Bartlett* case, *supra*, presents facts congruent with those of this case in all material respects save one. Those facts are set out in the opinion of the Circuit Court of Appeals. *Id.*, at 496–497. There the appellee operated a terminal elevator facility in Kansas City, Kansas, in the Fairfax District. Grain was purchased by the appellee from local elevators located at various points inside Kansas, and shipped to the terminal facility in Kansas City, where it was graded and placed in storage for eventual resale to out-of-state customers. No grain was purchased to fill any preexisting contract for resale. Rather, the grain purchased by the appellee was mixed and blended from that in storage to suit the requirements of each resale agreement as made. All shipments of grain from local elevators to the appellee's terminal facility were by common motor carrier under contract with the appellee, and the rates of such carriage were negotiated individually by the appellee with each carrier. The action was brought by Bartlett & Co. to enjoin enforcement of state regulatory action, in particular, the fixing of a tariff upon the carriage of grain by the Kansas Corporation Commission. It was there held by the trial court that the carriage from the local elevators to the terminal facility was but an incident to a movement in interstate commerce, over which the State of Kansas had no regulatory authority. Affirming the District Court, the Court of Appeals held that the appellee was entitled to the injunction

preventing enforcement of any attempted state regulation of rates of carriage.

"* * * It is well established that goods ultimately destined for shipment to another state acquire the character of interstate commerce as soon as they begin their journey, even though there is a temporary break in transit in the state of origin. [Citing] The principle applicable in determining whether a shipment is one in interstate commerce was stated by this court in Wycoff Co. v. Public Service Comm'n of Utah, 195 F.2d 252 (10th Cir.): 'If there is a continuing intent that the goods shall be transported until they reach a designated place, the entire transportation is a continuing one, notwithstanding that there may be a temporary stoppage enroute for a particular purpose.'" State Corporation Commission v. Bartlett & Co., Grain, *supra,* at 497.

So stating the rule, the court noted that none of the grain purchased by Bartlett & Co. was destined to satisfy any pre-existing contract for resale. This fact was held not to be determinative of the nature of the shipments.

"* * * (T)he grain was not always purchased to fill existing contracts out of state before it was shipped to the * * * [terminal elevator]; nonetheless, all of the grain purchased for the truck bins was in fact eventually shipped to out of state purchasers. * * * This certainly demonstrates an original intent to move it in interstate commerce, and the deposit at the terminal elevator and the handling there did not change the character of the movement." *Id.,* at 497–498.

Considering the totality of the circumstances shown to exist in connection with the operations of Bartlett & Co., the court held that:

"* * * from the time of purchase and shipment to * * * [the terminal facility] until the time it was sent to out of state buyers, the activities in connection with the grain were performed in furtherance of a clear intent that it ultimately be delivered to a buyer outside of Kansas. The shipment to * * * [the terminal facility] was but the commencement of this movement." *Id.,* at 498.

An examination of the opinion in *Bartlett* clearly indicates that the plaintiff in this case must succeed, unless there be some factual basis upon which this might be distinguished. As has been previously noted, there is but one difference between them.

In the *Bartlett* case, all purchases of grain were made, shipments ordered, and rates negotiated, by the appellee, the operator of the terminal facility at Fairfax. In the present case, the grain is shipped by the local cooperative to the Fairfax terminal elevators operated by Farmers Union, and title thereto does not pass to Farmers Union until the shipment has been graded, and the grain purchased. The local cooperative, rather than the terminal facility, contracts with the carrier, and negotiates the rate of carriage. The shipment may be diverted from its destination at the pleasure of the shipper, Farmers Union having no control whatever over the shipments until the purchase is complete. The question presented is, therefore, whether this distinction is sufficient to to take the present case out of the rule in *Bartlett,* so that the shipments to Farmers Union should not be considered as being in interstate commerce.

The most prominent factor in the *Bartlett* decision, as evidenced by the language already quoted therefrom, is the "original" and "continuing intent" that the commodity in transit remain so until it reaches a final destination outside the state wherein the carriage commenced. This is also true of the earlier decisions of the Supreme Court, upon which the Court of Appeals relied. *Cf.* United States v. Erie R. Co., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187 (1929). However, there is nothing in the cases to indicate whose intent is to be regarded as controlling; whether it be that of the shipper of the particular shipment in question, or some generalized intent, being that of all the parties to the transaction.

It might be thought that, because title to the shipments of grain involved here did not pass to Farmers Union until the shipment had reached the Fairfax facility, the shipment prior to passage of title should be considered as separate and, in this case, intrastate in character. The defendants strenuously urge this proposition. However, it does not reflect the rule developed in numerous decisions of the Supreme Court. These are well summarized in Powell v. United States, 112 F.2d 764 (4th Cir. 1949), where the following appears:

"* * * (T)he nature of the shipment is not dependent upon the question when or to whom the title passes. Pennsylvania R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 465, 466 [35 S.Ct. 896, 59 L.Ed. 1406] * * *. It is determined by the essential character of the commerce. Baltimore & Ohio S.W.R. Co. v. Settle, 260 U.S. 166, 170 [43 S.Ct. 28, 67 L.Ed. 189] * * *. It is not affected by the fact that the transaction is initiated or completed under a local bill of lading which is wholly intrastate, Ohio R. R. Commission v. Worthington, 225 U.S. 101, 108–110 [32 S.Ct. 653, 56 L.Ed. 1004] * * *; Texas & New Orleans R. Co. v. Sabine Tram Co., 227 U.S. 111 [33 S.Ct. 229, 57 L.Ed. 442] * * *; Hughes Bros. Timber Co. v. Minnesota, 272 U.S. 469 [47 S.Ct. 170, 71 L.Ed. 359] * * *; or by the fact that there may be a detention before or after the shipment on the local bill of lading, Carson Petroleum Co. v. Vial, 279 U.S. 95 [49 S.Ct. 292, 73 L.Ed. 626] * *."
Id., at 766.

The total import of this analysis of the cases is that the nature of any shipment of goods, whether interstate or otherwise, is to be determined not by any particular intention of the parties but by the essential character of the movement. Confirmation of this thesis is readily found. Western Oil Refg. Co. v. Lipscomb, 244 U.S. 346, 349, 37 S.Ct. 623, 61 L.Ed. 1181 (1917); South Covington & C. St. Ry. Co. v. City of Covington, 235 U.S. 537, 545, 35 S.Ct. 158, 59 L.Ed. 350 (1915); Chicago, M. & St. P. Ry. Co. v. Iowa, 233 U.S. 334, 343, 34 S.Ct. 592, 58 L.Ed. 988 (1914); Railroad Comm. of Louisiana v. Tex. & Pac. Ry., 229 U.S. 336, 33 S.Ct. 837, 57 L.Ed. 1215 (1913); So. Pac. Terminal Co. v. Interstate Commerce Comm., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911). Therefore, in determining the nature of a shipment, it is the *essential character* of the commerce that is decisive. The intent of the parties formed at the time of the initial movement is indicative of this essential character.

Examination of the facts upon which the present case devolves demonstrates the illogic in attemping to isolate the shipments which the defendants seek to regulate from the larger operation of which they are a part. The substance of Farmers Union's function is the creation of a continuous flow of grain commodities from various points inside the State of Kansas, through its storage elevators, and into foreign commerce. True, no shipment is received at the terminal facility subject to a contract of resale already executed in favor of a foreign purchaser. But the nature of the commodity in which plaintiffs deal makes such transactions virtually impossible. Grain production is necessarily seasonal. In order that a continuous supply be available, it must be collected and stored, to be sold as the need for it arises. Such circumstances were recognized by the *Bartlett* case, *supra*, as not detracting from the interstate nature of shipments to a terminal facility. That reasoning is just as appropriate here.

Defendants contend that, because control remains with the local shipper until consummation of the transaction at the plaintiffs' terminal facility, and because the shipper has the right to divert his shipment at any time prior thereto, the shipments ought not be considered as in interstate commerce. The answer to this is found in the decision in Lemke v. Farmers Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922), which involved circumstances quite similar to

those present here. In that case, the court held:

"* * * It is true * * * that after the wheat was delivered at complainant's elevator, or loaded on the cars for shipment, it might have been diverted to a local market or sent to a local mill. *But such was not the course of business.* The testimony shows that practically all the wheat purchased by the complainant was for shipment to and sale in * * * [an out of state market]. *That was the course of business, and fixed and determined the interstate character of the transactions." Id.,* at 55, 42 S.Ct., at 246. (Emphasis supplied.)

The foregoing should sufficiently indicate that the shipments with which this case is concerned are movements in interstate commerce. The fundamental nature of the shipments, and not the accidentals, is determinative. The matters upon which the defendants rely to establish their right to impose tariffs upon these shipments; title to the goods shipped, control of and right of diversion over the shipments, and the like, are accidental to the "essential character" of the operation as a whole. These shipments, from the local elevators to the Fairfax terminal, are in fact an initial movement in a continuous flow of grain commodities from Kansas producers to out of state consumers. This is interstate commerce in its purest form.

■ Nevertheless, the defendants contend that, because the local cooperatives remain owners of the shipments until sold at the terminal facility, they have no interest in what is done with the grain after it reaches Fairfax, and cannot have intended to place such shipments in interstate commerce. They argue that the intent existing at the time of the initial movement of a shipment of goods fixes its character in the flow of commerce, and, therefore, conclude that the shipments in question must be in intrastate commerce and subject to state regulation. In a sense, that is correct, but it assumes too narrow a view of the concept of intent. Properly considered, the question of intent concerns itself not with the personal motivation of the individual shippers, but with their intent as respects the movement of the commodity in commerce. The first is clearly limited to the economic gains reaped by the local shipper; the second relates to the flow of commerce which he initiates by his shipment. The authorities on this subject say nothing to indicate that the "continuing intent" must be that of the party having control of the shipment at any particular point in its movement, nor do they limit the scope of this concept to the elemental motivating factors behind the acts of each of the initiating parties.

The determination of an intent requires, in every case that inquiry be made into the mind of some person. And state of mind can be determined only circumstantially, by reference to the series of acts to which it is related. Here, the intent of the local cooperatives, as manifested in their conduct, is to place their grain in commerce, and to move it to a purchaser whose entire operation is designed to export such shipments outside the state. It would be unduly naive to suppose that the initial shippers are unaware of the nature of Farmers Union's operations. It is in their best interest to supply it with the commodities necessary to continue them. Nor can the fact be ignored that the very nature of the grain industry of the State of Kansas requires that grain be exported from the state. Were this not done, that industry could not continue to exist. On these facts, it seems clear that the intent of the local cooperatives is to place the grain shipped to Farmers Union in the hands of an export facility, for eventual shipment outside the state. This is the intent which is required by the law. Consequently, the shipments by motor carrier from the local elevators must, under the authority of the *Bartlett* case, be considered as the initial movement of grain, in interstate commerce. This being so, the rule in *Bartlett* governs the situation here, and the shipments from the local elevators to Farmers Union are exempt from state tariff reg-

ulation, by reason of federal pre-emption of the field. The plaintiffs must have their judgment.

The plaintiffs' motion for summary judgment will be granted, and the defendants' motion for summary judgment will be denied.

An injunction will issue permanently enjoining the defendants, their agents, attorneys and employees from enforcing any tariff regulation against the plaintiff motor carrier in this case, or against any other persons similarly situated.

Counsel for plaintiffs will submit an appropriate order.